Thank you, everyone. All right, we're proceeding to Case Number 2. It's Appeal Number 25-2125, Teva Pharmaceuticals, Inc. v. Eli Lilly and Company. All right. Everybody's settled here. We have Mr. Burgess. Welcome. Thank you, Your Honor. Good morning, Your Honor. Brian Burgess for Teva Pharmaceuticals. The party settlement agreement provided Teva with rights that extend beyond a license to specific patents. In particular, Section 5.2c of the agreement is a freedom-to-operate provision that generally prohibits Lilly from taking actions to prevent or delay the approval or marketing of Teva's generic product as of the entry date. Trying to escape that provision, Lilly argues that the entire settlement agreement automatically terminated once the patents licensed in Section 4.1 expired, freeing Lilly to obstruct, which is what we allege it did. But the agreement has no expiration date and does not tie any of its covenants to patent expiry. Section 4.1 shows that the parties knew how to tie specific rights to the, quote, duration of the Lilly patents, end quote. But Section 5.2 is not written that way, nor is the agreement as a whole. Nonetheless, the district court disregarded that textual difference and concluded on a motion to dismiss that the expiration of the Lilly patents relieved Lilly from all of its rights and obligations just 19 months after the agreement was entered. That's contrary to the text and structure of the agreement and leads to results that are commercially unreasonable on their face. Particularly on a motion to dismiss, we think it's untenable and the court should reverse. I'd like to start with the textual and structural arguments and then comment on the commercial context as well as Lilly's argument that our position leads the settlement to apply in perpetuity. So focusing first on the text, the relevant provision here, 5.2, specifically indicates that it is going to apply while the settlement agreement is in effect, while the agreement as a whole is in effect. There's no provision of the agreement that indicates it terminates on a specific date. There's no language that suggests that it terminates when the Lilly patents expire. Again, Section 4.1 shows that the parties knew how to tie specific rights to the duration of the Lilly patents. I think it's notable that several of the cases Lilly cites where a full settlement agreement was tied to the expiry of a license, that's exactly the language you see, that the full settlement, the full covenants, the obligations are being tied. That's the Waterloo case, that's the Alex Sam case. So I think that textual indication indicates that you cannot limit the entire agreement, you cannot limit the covenants to the duration of the Lilly patents. There's no expiration date. Instead, the default rule under Indiana law applies that the settlement agreement, including the covenants, apply for a reasonable time. So what's that reasonable time? Sure, Teva's position is that the reasonable time is while Teva is continuing to market this product. I understand Lilly has taken the position that that's essentially perpetuity. I don't think that's right, and that's inconsistent with the cases that they are relying on. In particular, the Hayworth decision that features prominently in their briefs, for example, at page 25, the relevant time period there that was allowed, that the court blessed, was while a corporation remained in existence, and the court distinguished that from perpetuity. So we think in this context, and I think it's also important to note that the relevant covenants that are at stake are negative restrictions. The district court took the view that the indefinite nature of how long this might last was unfair to Lilly, the burden it might impose, but all that is required of Lilly is to not obstruct Teva's approval in marketing, and 5.2c specifically carves out ordinary commercial activities. So we don't think there's a burden on Lilly. As we noted in our briefing and citing the Williston Treatise, the common law recognized that negative promises like that can generally, it's reasonable for them to apply. Releases and covenants not to sue are usually permanent, right? Covenants not to sue. Yeah, and releases. And releases. I think that's right, and I think... Could I ask you, Mr. Burgess, to address, to make sure that I understand when the relevant activity that you allege breached the agreement occurred so that we understand, in essence, how far out you have to keep the settlement agreement in effect to prevail? Sure. The relevant conduct does post-date the expiry of the Lilly patent, so we're not taking issue with that. It comes up in the context of Lilly seeking approval for an exclusivity in the 2020 period onward, especially in... How far on? Well, TEPA got approval in 2023, and there's no allegations of... So it ends by 2023. Right. That's all a jury would need to be deciding in this case, for example, is that at that time, the relevant conduct, there was still an agreement in effect and that Lilly's conduct was inconsistent with it. A jury wouldn't have to decide how long it goes forever. I did want to reference you noted covenants. Covenants not to sue. This agreement also includes those types of provisions in 5.1.  Mr. Burgess, could I ask you, in essence, what took you guys so long? Why did you miss the August 19, 2019 date? It's not in the record. I guess what I will say is it's not uncommon for complex generic products to take a significant time to get approval. That was known in particular with this product. We noted in our brief... Well, then it begs to reason why, because you are arguing about what would have made business sense to TEPA. Why does TEPA then enter into a contract that has this six-month or 60-day buildup and then the one-week period, if it's not uncommon that things don't go according to plan? I mean, TEPA certainly wanted to get approval and wanted to take advantage of this market opportunity to launch as of the entry date. I mean, we're not disputing that TEPA was working to get that approval, and that was its best-case scenario, but I don't think it follows that TEPA assumed it would necessarily get the approval or was indifferent to what the rights would be going forward after that if it didn't get approval before the entry date. I also think, again, this is a motion to dismiss, and the arguments that Lily makes about what the parties all understood and what the intentions were are not in the pleadings, are not supported by the plain text of the agreement. I think it's relevant that... These are parties that engage in these kinds of settlements often. These are common in the industry. We think if there were further discovery on this issue, we would be able to develop evidence that this kind of a provision functions as a freedom-to-operate provision, that there's basically a time 1 and a time 2. In time 1, there were restrictions on TEPA's ability to enter the market. That's reflected in covenants that TEPA makes in the agreement. But after that period, after the entry date, Lily is not supposed to take actions that would obstruct our approval. And I think it's also... It's important to note that those... The things that Lily agrees that it was not allowed to do, at least before the entry date, might have nothing to do with the Lily patents. It's acknowledged, for example, that it couldn't have brought a suit to challenge FDA's approval or to bring a citizen petition to challenge FDA's approval on grounds that would have nothing to do with the patents, that it couldn't do that on August 19th. But then the suggestion is that it could bring an identical suit, seeking essentially identical relief, to stay the approval, to vacate TEPA's approval, and to kick us off the market one week after we'd entered. And I don't think that that is a commercially reasonable understanding of the agreement. It's certainly not one that can be imposed on a motion to dismiss on the pleadings. So Lily's telling us that all of your concerns about such litigation after the expiration of patents are just speculative hypotheticals. Would you address that? Sure. They say that. I think it proves too much, among other problems for their position. So to start with 5.1a, which is the covenants that we provide to Lily that we are not going to bring particular suits to challenge their procurement or their enforcement of their intellectual property. There's no reason... Which I think would pick up, for example, an antitrust suit challenging their use of the intellectual property. There's no logical reason why that promise would cut off in 19 months when the Lily patents expired, when a statute of limitations on a Sherman Act claim certainly would not have run. As I understand their response, it's like, well, we don't think that would be a very strong claim. But that just suggests that the provision shouldn't have been there in the first place, that they didn't really think they needed it. But nonetheless, it's in the agreement. It was part of the bargain, and there's no logical reason to think that it would stop in 19 months when the Lily patents expired rather than continuing on as a broader covenant not to sue. I think that's also true going the other way of covenants Lily made to us in 5.2a and b and 5.3 about not suing to enforce patent rights. Initially, you might think, well, it's tied to the patent, so it makes sense that those would cut off when the patents expire. But you can bring a damages claim for patent infringement up to six years later. And so that certainly would be a concern, especially because, as we noted in our reply brief, the covenant that's provided by 5.3 is broader than the license in 4.1. It extends not just to the Lily patents but to other related patents that share the priority date. So there's just a mismatch between their argument that once the patents cut off, all rights associated with it would fall away as well, and the nature of these commitments, which logically would continue onward. And I think it supports our general point that this agreement, sure, it settled a patent dispute. There's no question that that's a fundamental thing that it did. But it's a broader agreement resolving the disputes between these parties about Teva's desire to get a generic product on the market. It unambiguously includes protections that extend beyond just providing a license. Again, Lily doesn't dispute that 5.2c, as we understand it, would block suits against the FDA or citizens' petitions or other measures that have nothing to do with patent rights. So it's just not logical to think that those rights would be extinguished when the Lily patents expire. At a minimum, we think there would be the dispute of fact about that. As we've noted, the default rule that applies in Indiana law when the agreement as a whole doesn't apply a duration provision is that a reasonable time applies, and that is a quintessential question of fact. This court and Indiana courts have said that time and again. We noted the Randall division decision. I didn't see a response to that point in Lily's brief. If you had gone to market by the entry date, would Lily have breached the agreement by seeking supplemental exclusivity? Well, if we had gone to market by the entry date and then they took actions to try to revoke our approval with FDA, we think that well could have violated the agreement. There's a subtlety with how exclusivity operates that it only applies once to block approval of a drug. It's not something that applies when a drug is already on the market, so it wouldn't have affected Teva in that instance. I think that actually sort of underscores the unreasonableness of Lily's position. They understood, according to their assumption, any exclusivity would not have done anything to block Teva's ability to get on the market because they assumed we would have been on the market before then, but they're nonetheless saying because it took us longer, they can now use this exclusivity as a sort of a windfall for them to defer generic competition and keep this generic access from patients for a longer time. We don't think that is supported by the text of the agreement and we don't think it's supported by the structure and it's certainly not something that could be determined on a motion to dismiss against us. Unless the court has further questions, I could reserve the balance of my time for rebuttal. Very well. Okay, and Ms. Sherry. Welcome. Good morning, Your Honors. May it please the court, Melissa R. Bechery, on behalf of Eli Lilly. I want to touch on a couple of points that were raised. Judge Kohler, I want to start with your question, what is the reasonable time they're proposing? I have the same question. The key to the district court's decision below was it was faced with two alternative interpretations of contractual language, and that's what we're interpreting today, right? It's a contract interpretation question. There are 10 words at the beginning of 5.2 that say during the time that the settlement agreement was in effect. And the district court was faced with the question, I have two interpretations before me. One is when the Lilly patents expire in August 19, 2019. The other is in perpetuity or for however long we choose to sell our product. The district court found their interpretation unreasonable, found our interpretation reasonable, and so said there's no ambiguity. I can grant a motion to dismiss. On appeal, they didn't press what they told Your Honor today. They didn't say in their briefs, we think the better way to interpret this is for however long we sell our products. They didn't say it's in perpetuity. Instead, they shifted gears entirely and said, forget what those 10 words actually mean. Really, what you should be doing is something very different. You should be looking to Indiana law, and they have a background rule or a default rule when they're silencing an agreement on termination, and you should just read in, or really on remand, the district court should read in whatever reasonable time is. They never made that argument to the district court. I think they didn't make it for a very good reason, but that argument is textbook waiver. They did not give the district court that option at all. I was very surprised when my friend on the other side when asked the question. Do you think this is like baseball arbitration? What? The district judge has to accept one party's view or the other? Absolutely. No, no, but I do think the meaning of ambiguity, because what was being argued below is, is there an unambiguous meaning? Is there an ambiguous meaning? Do we get past? For you to prevail, it has to be unambiguously terminating as of the entry date, right? For us to prevail, it has to be unambiguous, and the question of ambiguity, and we cite a number of cases on page 18 of our response brief that's just sort of black letter law and what it means for a provision to be ambiguous, and it's when there's more than one reasonable interpretation, which is why we've been trying to focus on, okay, if we're wrong, if it's not our interpretation, what is it? And we've been trying to get that answer, and the answer keeps shifting. And reasonable time to clear it. Sorry, Your Honor. Well, I understand it's a difficult problem. The contract has lots of date references, right, that are quite carefully drafted, but it doesn't have a termination date. In your view, for the settlement agreement to have been in effect, language of 5.2, does that mean all the terms have to have still been in effect, or does it apply if any terms are still in effect? I think all of the primary terms need to still be in effect, and let me explain what I mean by that, because I think it goes to the confidentiality argument that they're making. I don't think it matters if there's ancillary terms in the agreement that might have some force after the agreement is no longer in effect. So from this text, you infer a distinction between primary and ancillary terms? I do, and it's based on how courts generally treat ancillary terms. So, you know, we're talking about the confidentiality provision, but if you look at 7.3 in the agreement, it's a governing law provision. And so when you have governing law provisions, arbitration provisions, you know, things like that, they often survive. In fact, most often survive termination of the agreement. So even when an agreement's no longer in effect, those provisions tend to survive. So I don't think they're a good way to interpret what in effect means here. It gets us a long way from the text, however. I don't think it does, and I actually do want to talk about the text, because I think the real problem with their interpretation is it reads out so many words in the text. Your Honor pointed out that there's other timing provisions in here. They are, and they all come back to the same place. And so not only does their reading not give force to the 10 words in 5.2, they kept talking about 5.2c, which is the covenant at issue here. The problem is they didn't bargain for the protection they're asking for. If you look at 5.2c and specifically look at the final words in 5.2c, Lilly did not agree not to interfere in any way for all time. What 5.2c says, and this is on page 55 of the appendix, it says Lilly will not prevent or delay all of the things listed as permitted under the terms of the settlement agreement. So the question is what did Lilly permit under the terms of the settlement agreement? And for that, you go back to Section 4, and when you look at Section 4, you see exactly what was permitted. That's where the license is. That's where the 60 days they get to get ready to market before the entry date. That's where the contractually defined entry date is no later than August 12th. And so 5.2c is not an agreement not to interfere forever. It is time limited by what's permitted in the settlement agreement. We made that point in our response brief on pages 29 and 30, and they still haven't responded to what work that language does if it's not what we say it is. The other really key contractual provision to look at for timing purposes is 4.1 itself. The second sentence is specific to the issue that they're pushing here, which is the waiver of regulatory exclusivities. And what that waiver says is Lilly will waive regulatory exclusivities as necessary to effectuate the license as of the entry date. And so to go back to sort of the shared understanding of when they thought they were going to market, if their whole point is, yes, we thought we would get approval sooner, yes, we had hoped to market sooner, but we kind of protected ourselves in case that was not the case, they didn't. They entered into a specific agreement on the waiver of exclusivities, and it is limited to what is necessary to effectuate the license. So this is before the expiration of the Lilly patents. And so you have that language. You have the 5.2c language. You have the 5.2 durational language. And when you put it all together, the only reasonable interpretation is the one that we gave the district court, which is expiration of the Lilly patents. Getting back to your, it may have been inadvertent, distinction between ancillary and primary, would the statutory right that a patent holder has to bring a patent infringement suit for up to six years beyond, would that kind of fall into the ancillary camp so it shouldn't affect our analysis here? No, no, I would put that in the core camp, and that's actually a great. I want to go to their August 20th hypotheticals, you know, why would the parties want these agreements not to bring suit to end on August 19th, but you could bring the suit on August 20th. They are fanciful hypotheticals for a couple reasons. Most of them just fail on their own terms. For example, the patent infringement suit that Your Honor is talking about, they had a license, they had a covenant not to sue, and if they infringed and breached the agreement, then the beginning of the covenant itself says, you know, all bets are off. And so there was no world in which they were going to be liable for past damages unless they breached the settlement agreement. And so that wasn't a concern that needed to be bargained against. The other examples they give sort of fall apart on their own. The APA suit that's been talked about a few times, there is a covenant not to sue in this agreement. It's 5.2a, and it's a very narrow one. It's just about patent infringement, so it wouldn't cover the APA suit at all, which is why they go to 5.2c to get to the APA suit. But as I just explained, 5.2c is limited by what's permitted under the terms of the settlement agreement. So putting aside the durational conversation we're having, that APA suit could have been brought on August 20th regardless because they bargained for a far narrower protection in 5.2c. It wasn't a hands-off, we'll never interfere with you ever agreement. And so that doesn't work. And so we're kind of left back with these hypotheticals that don't really pan out. Ms. Sherry, on that point, I guess in my experience on the district court, patent litigation was both endless and endlessly creative. And I'm trying to imagine, you seem to be saying, well, the kinds of suits that they're talking about would have been such obvious losers they would never have been brought, and we wouldn't have bothered marketing for them. And I'm trying to imagine the negotiating team for Lilly explaining to the general counsel or the board or the CEO why such cases brought on August 20th were not blocked by the settlement agreement that Lilly entered into to get peace in this area. And I think the answer is both 5.1 and 5.2 have this durational limitation to start with. Notably, the other provisions don't, including confidentiality. Those are the only provisions that say it's only in effect during the time of this settlement agreement. And if you think about what the parties were worried about at the time in January 2018, and to be clear, this is not me going outside the record. This is based on what they actually contracted for in the agreement and what's in the complaints and what we knew at the time. The ANDA had been pending for 29 months at that point. They had a year and a half, a full year and a half to get their ANDA approved, so 48 months to get their ANDA approved and to get to market. They're sophisticated parties. They know how this works. If they thought they needed additional protections beyond that, they could have bargained for it in a very direct way, like I said, in 4.1. And they also knew that these regulatory exclusivities, I mean, this maybe, Your Honor, goes to the breach question you asked earlier in trying to get a sense of the timeline. What are they saying the breaches actually are? Number one, they're saying submitting a supplemental NDA based on studies that had been ongoing for decades that they knew about. This is in their complaint at paragraph 27. They knew about these studies. They knew there was going to be submission of a supplemental NDA. They knew the supplemental NDA had been approved. They say again in their complaint that the approval was published. So they knew all of this. And they knew three years of regulatory exclusivity come with such approval. And so in 4.1, they said, when you get this regulatory approval, we need you to waive it, not forever, but so we can effectuate the license as of the entry date. The difficulty with their position now is they're now saying, forget the entry date as it was defined in the contract itself with a capital E and a capital D, but any entry date. You know, lowercase, any entry date, whenever we get around to it, whenever we choose to enter, you know, that's fine. And then for however long we want to market it. Maybe that's not exactly in perpetuity, but that's pretty close. I mean, there are drugs that have been on the market for many, many decades, ibuprofen, acetaminophen, penicillin, right? That is a very long time. It's also completely one-sided. The idea that the end date that they're now saying, and again, they don't have this in their brief, but the end date they now want to, you know, put all their eggs in that basket is basically for however long we choose to market. Why would, in having the conversation that your Honor envisioned, why in the world would Lilly agree to that? Tava, however long it takes you to get your ANDA approved, however long you choose to stay on the market, we'll do nothing. We'll sit on our hands with respect to our product. We won't submit the information that FDA requires us to submit. We won't take on a regulatory exclusivity that, by the way, not just keeps Tava out of the market, but would keep its generic competitors out of the market as well. It just makes no sense. Would it have been possible for Lilly legally to submit that information to the FDA and indicate, but we are not asserting any right of exclusivity against Tava? So no, and I think that's really important. If you look at footnote four of our response brief, we explain why. The FDA has a policy that it will not take selective waivers before exclusivity is granted. And so before you actually have the exclusivity, you can only relinquish your three years entirely. And that's not something Tava would have wanted because, again, if it was relinquished entirely, it would mean that generic competitors like AvaTax could have come to the market sooner as well. You can selectively waive, but only after the exclusivity is granted. We cite a DDC case that upholds the FDA's policy with respect to that when it comes to a different exclusivity, the 180 days. If you look in their reply brief at footnote six, they try to say, well, maybe the 180 days are different, but they don't cite anything for that. So if I'm following you, and I may not be, but you guys are all experts in this 355 stuff, and we're not. But if Lily had gone to the FDA, as it did, and then gotten the exclusivity granted and then said, okay, but this doesn't apply to Tava, would that have violated any laws or policies? After it got exclusivity granted? No, and Lily did that. So this is the other problem. I thought their claim was that you did not grant the waiver, ask for the waiver that they would have been entitled to. It's a little unclear. I think their complaint is that we didn't do it sooner. But if you look at both how things work in practice, the FDA would not do anything with it until exclusivity was granted, which did not happen until October of 2023. And to the extent it's helpful, we have an addendum to our brief with a timeline because there's a lot of different dates at issue here. But that didn't happen until October 2023. The other key point is that the agreement, 5.2D, specifically addresses, we don't think it applies for timing reasons and other reasons, but 5.2D, the notification to the FDA provision is triggered by Tava giving written notice, asking Lily to provide that notification to the FDA, and that letter requesting the waiver come in didn't happen until October 2023 either. At that point, Lily said, I don't think we're required to do this, and this is in their complaint as well, but ultimately sent in a letter to the FDA waiving exclusivity with respect to Tava. How does this exclusivity benefit anybody when the FDA grants it a month before it expires? That's an excellent question. It granted it retroactively, and, you know, the other thing that is in their complaint for what it's worth is that Lily did send a letter to the FDA saying please promptly publish this in the Orange Book. This is in, I think it's either Paragraph 47 or 49 of their complaint. And so, you know, the notion that Lily was, you know, doing anything that was a secret or was hiding things just isn't consistent with the allegations of their complaint, and also the notion that Lily either could have done something more or certainly was required to under the agreement doesn't hold up either. Okay. I need to ask you if I could, with indulgence of my colleagues, you introduced me to a passage of the Scalia-Garner book I had not seen before. Yes. About not expecting perfection in drafting. It's given the level of sophistication and expertise of these parties and their counsel. It's a little difficult to credit that. But particularly, you seem to be asking us to say that while this agreement is in effect, it means the same thing as when the patents expire. And, you know, take the USA Gymnastics case, take the Collins against Notre Dame case that it's cited, a zillion other cases by this court, that's a pretty strong presumption. Different language means different things. So let me, I was hoping to have a chance to get to this. Let me get to that. Let me add one more case to the list, which I think is directly on point. It's a case that's called Vesuvius. It's cited in their opening brief. It's at page 27 of their opening brief. And that's a perfect example of this court saying it's essentially defeasible by context of what was going on in that case. It was an agreement that said you have to give notice of a dispute within four months. And the question was, does dispute mean lawsuit? Or does it just mean letting them know there's an issue or a complaint? And what the court there said is, sure, there's other provisions in this agreement that say action or proceeding. And kind of fair enough, that would have been better to use those words. But when we look beyond that and we look at the context of the agreement as a whole, we think it is unambiguous, and we're going to affirm a motion to dismiss and say that dispute means lawsuit. Because interpreting it a different way would make other language in the agreement superfluous. And so I think what that case shows is essentially what the Scalia and Garner treatise also points to. Sure, it's a tool of contract interpretation, and we certainly wouldn't be here if that language was used. But it definitely isn't dispositive, and it doesn't get them to what they need to get to. On Notre Dame, actually, I think that's a good point. So in Notre Dame, what the court was very clear about is that rule has force when there's another reasonable interpretation that it's susceptible to. You still need kind of something on the other side of the ledger. And that's our key point here, that there's no alternative. I understand that's your point. I do want to ask you, though, also, if we read the statute or, sorry, the contract here differently than you do, are there any factual issues that you see as to whether the settlement agreement was in effect through 2023? Oh, yes. I mean, we would, if you don't think it's unambiguous in our favor, I think that there absolutely would be additional evidence to point to to lead to that same result. Like what? We've got an integrated agreement, right? What? It's an integrated agreement. It's an integrated agreement, but I think the other side's also arguing for being able to point to extrinsic evidence to support it. Both of you are, but my question, counsel, is whether that's worth the candle, if we were to disagree with you. Well, I think it is worth the candle, but I also think there's multiple other arguments. I mean, in looking at the language of 5.2c, which is the covenant that they're saying is breach, I think there's pretty dispositive arguments that there was no breach here anyway, even putting aside the situational issue. But, yes, I think there would be additional arguments to make. I really don't. You have lots of arguments about whether there's a breach and about damages, but about the timing. Yes, we would still have an argument with respect to the timing. What would that look like? What would that look like? It would look at party intent at the time, extrinsic evidence as to what the views were in terms of when the ANDA was going to be approved, what they were focused on, things of the type. Honestly, I'm spinning a little because we haven't, you know, it was a motion to dismiss. We haven't actually explored what the extrinsic evidence would be, but I imagine both sides would have extrinsic evidence. They would want a .2 to support their reading. If I could make one more, I realize I'm way over time. If I could just make one more point, we haven't talked at all about the reasonable time case law, and I just want to make very clear when you look at the Indiana cases and when they talk about reasonable time, they're doing something very different than what we've been talking about today. When you have contract language, you have to interpret it according to contract interpretation principles. You don't get to just go past that, throw up your hands, and read in reasonable time. And the Corbin Treatise that both parties cite, it's section 24.21, makes it very clear that even when there's not expressed durational language, the next thing you do is see if you can infer a durational time limit. All agree that the language in 5.2 is a durational time limit, and so contract interpretation principles, party intent is what has to control here, not some background default rule that applies only in the face of silence. All right. Thank you, Ms. Sherry. Thank you. Mr. Burgess for three minutes. Thank you, Your Honor. I wanted to begin by clarifying the nature of our alleged breach because I don't think it's consistent with what my friend Ms. Sherry indicated. Our primary submission is that Lilly, after the settlement agreement was entered, took actions to seek this exclusivity with FDA. It's not simply filing the application. They lobbied for that exclusivity, and they didn't inform either Teva or Lilly of the fact that we had covenants and we had waivers of exclusivity. Ms. Sherry argued that that's not possible. You can't do an advanced waiver for a three-year exclusivity. There's no support for that. The only cases and propositions they're citing is from the 180-day exclusivity context, which operates very differently because that exclusivity can be forfeited. That's the specific reason that FDA provides that that exclusivity can't have an advanced waiver. There's no cites that they give that I've seen that applies that to the three-year exclusivity context, which doesn't have such a forfeiture provision, and the FDA certainly allows advanced waivers in other contexts like pediatric exclusivity. In terms of what Lilly was doing and whether that actually held up Teva's approval, that's what we allege in the complaint, that FDA identified by the summer of 2023 that there was a complex regulatory issue that was what was preventing us from getting approval faster, and FDA later acknowledged that they're determining whether Lilly was entitled to an exclusivity that would block our product. So those are the allegations that are in the complaint, and there's no basis to question those at the motion-to-dismiss stage. I wanted to respond to the arguments about waiver, and also I can point out a waiver on Lilly's side. Teva's been consistent in its position. We made clear in the district court, this is at page 138, that we were not seeking an in-perpetuity reading. We were responding to a motion to dismiss. Lilly argued that the agreement unambiguously stopped all of its obligations when the Lilly patents expired. We explained why that that was not the case, that that's contrary to the language and text of the agreement and not consistent with what we've alleged would be the commercial expectations in this context. They had, I think, a total of two sentences in their motion-to-dismiss referencing the perpetuity principle, specifically in reference to the Morgan Drive case. It's two sentences in their motion-to-dismiss. We then respond to it and say, we don't think you're reading that case correctly, and that's not what we're arguing in any event. Then when the district court relied more heavily on the perpetuity principle to tether 4.1 with 5.2 and the rest of the agreement, seeming to think that it needed a savings construction, that's when we pointed out that's not correct because there's no need to adopt a savings construction. There's a background rule that to the extent that the agreement is silent, that we understand that it will apply at least for a reasonable time, which is generally a question of fact that can't be resolved on a motion to dismiss. Lilly argues that the key language and suggests that we're reading it out of the agreement in 5.2 is it applies while it's in effect. But Lilly's interpretation is not giving any work to that provision because their position is that the entire settlement agreement, or at least the primary ones, however that's determined, would cease to operate. Mr. Burgess, could I ask you to respond to Ms. Sherry's argument about the last phrase, 5.2c, as permitted under the terms of the settlement agreement and whether that implies it ends as of the entry date? Sure. Two responses to that. We think that's not the best reading of it, that it is basically, that provision is doing the time 1, time 2 principle that I indicated before. It indicates that before the entry date, of course Lilly is allowed to engage in conduct that would be preventing TEVA from getting approval. TEVA specifically covenants in 5.1b that it is not going to take actions to seek approval and start to mark, well not to seek it, but it's not going to start to market or sell its product before the entry date. So we read those provisions as being in tandem. I do think this highlights the waiver point I wanted to make on Lilly's side and maybe I'll end with this. Lilly was very clear in district court, you can see this at page 154, and I think even in its appellate brief at page 19, that its entire argument was that the settlement agreement ceased to be in effect and that is why it was not in breach. I heard arguments from Ms. Sherry about why even if 5.2 was still in effect as of the date, they don't think their actions were inconsistent with it. That's not an argument that they made on the motion to dismiss. If it's something they want to develop at a later stage of the case, perhaps they could, but it is not a basis to affirm dismissal here. All right, well thank you, Mr. Burgess, and we will take the case under advisory. We'll take a brief recess.